# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Information associated with Yahoo!, Inc., e-mail account<br>abi_israel@yahoo.com which is stored at premises owned,<br>maintained, controlled, or operated by Yahoo!, Inc., 701 First<br>Avenue, Sunnyvale, CA  94089 | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No.   14-M-1220 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A.

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

which is subject to this Court's jurisdiction in the Eastern District of Wisconsin, pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed certain property, namely: those items listed in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§846 and 841(a)(1) | Conspiracy to possess with intent to distribute and distribution of marijuana |
| 18 U.S.C. §1956 | Money laundering |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT.

☐ Continued on the attached sheet.

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jay Novak, Special Agent, WI Department of Justice-DCI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5/22/14 @ 3:45 p.m.

_____
*Judge's signature*

City and state:  Milwaukee, Wisconsin

William E. Duffin
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with Yahoo!, Inc., e-mail account abi_israel@yahoo.com which is stored at premises owned, maintained, controlled, or operated by Yahoo!, Inc., 701 First Avenue, Sunnyvale, CA 94089.

**ATTACHMENT B**

**Particular Things to be Seized**

I.      **Information to be disclosed by Yahoo!, Inc.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Yahoo!, Inc., including any emails, records, files, logs, or information that has been deleted but is still available to the Yahoo!, Inc., or has been preserved pursuant to requests made under 18 U.S.C. § 2703(f), Yahoo!, Inc., is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

    e.      All records pertaining to communications between the Yahoo!, Inc., and any person regarding the account, including contacts with support services and records of actions taken.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of Title 21, U.S.C. §§ 846 and 841, and Title 18, U.S.C. § 1956, those violations involving the account and occurring after September 2012, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

    a.      Communications, files, and attachments that contain evidence of the manufacture, delivery and/or sales of illegal controlled substances; specifically marijuana, and evidence pertaining to money laundering.

    b.      Information relating to who created, used, or communicated with the account, including records about their identities and whereabouts.

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR SEARCH WARRANTS

I, Jay Novak, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application for search warrants for information associated with certain Yahoo! Inc. accounts that are stored at premises owned, maintained, controlled, or operated by Yahoo! Inc., (hereinafter "Yahoo") an email provider headquartered in Sunnyvale, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Yahoo! Inc. to disclose to the government records and other information in its possession, pertaining to the content and records associated with the target accounts.

2.    I am a state certified law enforcement officer currently employed by the State of Wisconsin, Department of Justice, Division of Criminal Investigation (DCI), as a Special Agent and have been so employed for the last nineteen years. I am also a federally deputized task force agent for the United States Department of Justice, Federal Bureau of Investigation (FBI). I have specialized training and experience in narcotics smuggling and distribution investigations. During my tenure with the DCI, I have participated in over 250 narcotics investigations, and have authored over 100 affidavits supporting wire and electronic intercepts, criminal complaints, search and seizure warrants. I have debriefed more than 200 defendants, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I am familiar with narcotics traffickers' methods of operation including the distribution, storage, importation, and transportation of narcotics, the collection of money which represents the proceeds of narcotics trafficking, and money laundering.

3.      The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant and does not set

forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit,

there is probable cause to believe that violations of Title 21, United States Code, Sections

841(a)(1), 846, and Title 18, United States Code, Section 1956 have been committed by Nathan

Froemming, Joel Froemming, Tyler Barnick, and others. I further submit that there is also

probable cause to search the information described in Attachment A for evidence of these

crimes, as described in Attachment B.

## PROBABLE CAUSE

5.      This investigation is ongoing and based on information obtained from other
Federal, State and local law enforcement officers during the course of their official duties, all of
whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to
case agents. Case agents are those federal, state, and local law enforcement officers who have
directly participated in this investigation, and with whom your affiant has had regular contact
regarding this investigation.

6.      Additionally, information has been obtained from interviews of defendants,
informants, and cooperating citizen witnesses. I rely upon the information supplied as that
information has been corroborated by the additional investigation described below.

7.      The Wisconsin Department of Justice, Division of Criminal Investigation (DCI) is
investigating Nathan Froemming, Tiffany Heizmann, Joel Froemming, Maureen Froemming,
Tyler Barnick, Abigail Harrington and others for conspiracy to distribute and distribution of
controlled substances, and money laundering. The investigation, to date, has included traditional
law enforcement methods, including, but not limited to: interviews with confidential sources and
sources of information; information from other law enforcement officers; documentary evidence;
pen register, trap and trace, and telephone toll data; cellular telephone location monitoring,
cellular telephone text message content review; electronic tracking device data; physical
surveillance; and, financial records examination.

8.      In September 2012, Special Agent Jay Novak spoke with a confidential citizen
witness, (hereinafter "CI-1)", who expressed a desire to remain completely anonymous.

2

9.    CI-1 stated that Nathan Froemming was selling multi-pound quantities of high grade marijuana in the Waukesha area. CI-1stated Froemming's live in girlfriend, Tiffany Heizmann, and Froemming's parents are aware of Froemming's drug dealing. Nathan Froemming and Tiffany Heizmann have since married during the summer of 2013.

10.    In 2012 or 2013 Heizmann and Froemming bought a house in the area of the Town of Wales/ Town of Waukesha, Waukesha County where they reside with their infant child. The house was purchased in the names of Heizmann and her mother, Helga Scrimp.

11.    CI-1 stated that Heizmann and Froemming were remodeling their residence with drug proceeds. Froemming was unemployed, but had purchased a new dark blue pickup truck this year and a Kubota tractor.  Heizmann drives a newer Jeep Cherokee which was purchased with drug proceeds.

12.    During the summer of 2012, CI-1 further stated that CI-1 observed large sums of money in their residence.  CI-1was told that Froemming obtains 20-40 pound quantities of marijuana from his California source.

13.    Froemming obtains the marijuana from a sibling who lives in northern California. In 2013, CI-1observed marijuana in bags in a kitchen drawer at the residence of Froemming and Heizmann. CI-1 believes Froemming travels to California to pick up shipments of marijuana from his sibling, but also thought shipments might be driven to Wisconsin by the California source.

14.    Froemming also made reference to storing drugs and drug proceeds at his parents' residence which is in Sullivan or Ixonia, Wisconsin. CI-1stated Froemming's mother's name is Maureen. CI-1 stated Froemming's parents know that Froemming is involved in drug trafficking, and that Froemming is unemployed. CI-1 stated that Froemming's father uses marijuana with Nathan Froemming and may be involved in sales of marijuana also.

15.    CI-1 also knows that Nathan Froemming has a cellular telephone bearing telephone number 262-337-2920.

16.    S/A Novak conducted records checks and identified a residence where Nathan P. Froemming and Tiffany M. Heizmann, reside which is W309 N174 Maple Avenue, Waukesha, Wisconsin which was purchased by Heizmann and her mother in 2012, thus corroborating CI-1.

17.    Froemming's parents were identified by vital statistics, bank and financial documents and databases as Joel P. Froemming and Maureen Coffey Froemming, who reside at W1957 Bakertown Dr., Sullivan, Wisconsin.

18.    S/A Novak also identified that Nathan Froemming owned a 2011 blue Dodge Ram 1500 pickup and Tiffany Heizmann owned a  2008 Jeep Grand Cherokee.

3

19.     A step-brother of Froemming was identified as Tyler Barnick who resides in Talmage, California, which is in northern California. Barnick has an arrest from 2004 in Idaho for possession of a controlled substance, trafficking a controlled substance, and possession of drug paraphernalia with a conviction for the possession of a controlled substance.

20.     Nathan Froemming has an arrest from 2010 with the Uinta County Sheriff's Department, Wyoming, for unlawful manufacture or delivery or possession with intent to manufacture or deliver a controlled substance, with a conviction for possession of a controlled substance from that arrest.

21.     In September 2012, DCI Special Agents Jay Novak and Ryan Shogren met with CI-1 at a location in Waukesha County, Wisconsin. CI-1 identified Wisconsin Department of Transportation file photographs of Nathan Froemming and Tiffany Heizmann as the subjects previously identified in this case. CI-1 also identified Maureen Coffey Froemming and Joel Froemming as the mother and father of Nathan Froemming and Tyler Barnick as Nathan and Joel Froemming's marijuana source from California and Barnicks' girlfriend / wife as Abigail Harrington.

22.     CI-1 stated Nathan Froemming and Tiffany Heizmann travelled to California in the past year to visit Barnick and Harrington.

23.     On September 26, 2012, the Honorable Magistrate Judge Nancy Joseph signed a warrant authorizing the electronic monitoring of location data in relation to cellular telephone number 262-337-2920.

24.     In October 2012, S/A Novak again spoke with CI-1 who advised that Froemming had become much more secretive about his drug dealing and both he and Heizmann advised CI-1 that Froemming was nervous about conducting his normal drug dealing activities at their residence as he believed someone, possibly law enforcement or otherwise, may be watching or surveilling Froemming.

25.     CI-1 stated Froemming was still dealing marijuana, but was not conducting as many transactions at their residence. CI-1 stated that Froemming was possibly storing a larger portion of his marijuana supply and drug proceeds at his parents' residence in Sullivan, Wisconsin. Froemming retrieves the marijuana from his parent's house on a need-be basis.

26.     On November 7, 2012, the Honorable Magistrate Judge Nancy Joseph signed an extension of the warrant authorizing the electronic monitoring of location data in relation to cellular telephone number 262-337-2920.

27.     During December 2012, the Waukesha County Metropolitan Drug Enforcement Group arrested two individuals for delivery of marijuana and possession with intent to deliver marijuana. The individuals were arrested subsequent to an investigation by the Waukesha County Drug Unit based on information received from a cooperating individual (hereinafter "CI-2"). CI-2 had provided information that the subjects subsequently arrested by the Waukesha

4

County Drug Unit were selling marijuana in a community in Waukesha County and were being supplied with the marijuana by another subject named "Joel" with whom one of the subjects worked. The subject and "Joel" were identified as being employed at Lake Country Foods in Oconomowoc, Wisconsin.

28.     An interview was conducted of the arrested subjects by the Waukesha County Drug Unit Officer and S/A Novak. The subjects, (hereinafter "CI-3 and CI-4"), respectively, agreed to provide information regarding their marijuana trafficking and source of marijuana. CI-3 identified CI-4 as the individual who obtained the marijuana that CI-3 and CI-4 sold; that CI-4 obtained the marijuana from an individual with whom CI-4 worked. CI-3 knew that the source of marijuana for CI-4 possibly obtains marijuana from the source's son. CI-4 identified CI-4's marijuana supplier as Joel Froemming who resides in Sullivan and drives a red pickup truck. CI-4 stated that CI-4 worked with Joel Froemming, and Froemming would conduct transactions with CI-4 at their workplace and would commonly leave the marijuana in his vehicle for CI-4 to retrieve. CI-2 also stated that Froemming obtains marijuana from a source of supply from California whom CI-3 believes is Joel Froemming's son.

29.     On December 21, 2012, the Honorable Magistrate Judge Nancy Joseph signed an extension of the warrant authorizing the electronic monitoring of location data in relation to cellular telephone number 262-337-2920.

30.     S/A Novak had contact with California law enforcement authorities who advised that Barnick owns two parcels of land in Mendocino County, California, and they believe Barnick has multiple marijuana grows on the two parcels. Law enforcement authorities also believe that there is a marijuana grow on a parcel in Ukiah, California, which address is associated with Barnick through database checks. There also appear to be greenhouses on the parcels, consistent with year round cultivation of marijuana.

31.     On February 4, 2013, the Honorable Magistrate Judge Nancy Joseph signed an extension of the warrant authorizing the electronic monitoring of location data in relation to cellular telephone number 262-337-2920.

32.     On September 21, 2012, November 19, 2012, January 14, 2013, March 5, 2013, May 2, 2013, June 28, and September 12, 2013, pen register and trap and trace orders were obtained from the U.S. District Court, Eastern District of Wisconsin for the cellular telephone number of Nathan Froemming.

33.     During the monitoring of the location data of the target telephone number, S/A Novak was able to determine a pattern. Froemming's cellular telephone traveled on a frequent basis to a close proximity to Nathan Froemming's parents' residence in Sullivan during each day; many times this was the first location that Nathan Froemming travelled to after leaving his residence. After traveling to the Sullivan area, the cellular telephone appeared to either return to Nathan Froemming's residence or make individual or multiple stops prior to returning to the residence. The locations were in close proximity to residences of suspected marijuana customers of Nathan Froemming. Based upon my training, experience and familiarity with the

5

investigation, I believe that after picking up marijuana from his parent's house, Nathan Froemming delivers it to his customers.

34. A review of the call data by S/A Novak revealed a large volume of calls between Froemming and his suspected marijuana customers.

35. The above travel patterns / location data and call data are also consistent with the witness information that Froemming was storing marijuana and / or proceeds at his parents' residence and then making deliveries to individuals.

36. On April 3, 2013, the Honorable William E. Callahan Jr. signed a warrant authorizing the installation and use of an electronic monitoring device on Froemming's blue 2011 Dodge Ram pickup, bearing Wisconsin registration HA8333, VIN: 1D7RV1GT1BS540971.

37. On April 19, 2013, the Honorable William E. Callahan Jr. signed a warrant authorizing the electronic monitoring of location data in relation to cellular telephone number 262-337-2920.

38. S/A Novak also observed a large volume of calls and text messages between Nathan Froemming and suspected marijuana customers of Nathan Froemming, as identified by the citizen witness. A review of the call data, with target telephone numbers identified through subpoenaed records, from the pen register and trap and traces on target telephone revealed the following:

a. 757 telephone contacts with target telephone number 262-354-5006, subscribed to by Axel Kolodzne between September 22, 2012, and March 25, 2013. Of those contacts, there were 487 text messages and 270 calls;

b. 553 telephonic contacts with his father, Joel Froemming, telephone number 262-719-5670 between September 23, 2012 and March 26, 2013. Of those contacts, there were 237 text messages and 316 calls;

c. 215 telephonic contacts with telephone number 262-719-0181, subscribed to by Craig Baumann between September 25, 2012 and March 27, 2013. Of those contacts, there were 142 text messages and 73 calls;

d. 64 telephonic contacts with telephone number 262-901-5107, subscribed to by Nicholas Magaw between September 27, 2012 and February 6, 2013. Of those contacts, there were 56 text messages and 8 calls; and

e. 34 telephonic contacts with telephone number 707-350-2345, subscribed to by Aileen Gaynor, with a user of William Gaynor, between November 10, 2012, and March 23, 2013. Of those contacts, there were 6 text messages and 28 calls.

39. A review of the drug-related criminal histories of Craig Baumann, Nicholas Magaw and William Gaynor reveals:

6

f.  a 2011 conviction of Baumann for possession of marijuana and drug paraphernalia (Jefferson County Case Number 2011CF000036);

g.  a 2012 arrest of Magaw for possession of marijuana and possession of cocaine; and,

h.  a 2000 arrest of Gaynor for possession of a controlled substance.

40.     On April 19, 2013, the Honorable William E. Callahan Jr., signed a search warrant for the Verizon Wireless telephone number of Nathan Froemming, 262-337-2920. This search warrant ordered the telephone company to provide documentation and copies of all stored electronic communications including all voicemail, text, and multi-media messages stored and other files associated with the Verizon Wireless target telephone number 262-337-2920, between March 4, 2013, and April 19, 2013.

41.     S/A Novak subsequently obtained documentation from Verizon Wireless required via the search and seizure warrant including documentation of some text message content from text messages that were sent between telephone number 262-337-2920 and others pursuant to a preservation order.

42.     S/A Novak reviewed the text message content received from Verizon Wireless. Due to various internal Verizon Wireless issues relating to the misfiling of the preservation requests for Nathan Froemming's cellular telephone records, only 6 days / partial days of text message content records were received based on the preservation requests that had been sent to Verizon Wireless.

43.     Based on S/A Novak's training and experience in narcotics and related financial investigations, S/A Novak believes the following text messages relate to drug trafficking:

a.  A text message on April 19, 2013, at 10:56 a.m., from Nathan Froemming to Axel Kolodzne, target telephone number 262-354-5006 which states, "Can u do the norm. By 4."

b.  A text message on April 19, 2013, at 12:55 p.m., from Axel Kolodzne to Nathan Froemming, target telephone number 262-354-5006 which states, "Yah bro no problem."

c.  A text message on April 19, 2013, at 9:02 p.m., from Axel Kolodzne, telephone number 262-354-5006 to Nathan Froemming which states, "Im leavein in a half houre u still want me to stop out or tamarro."

d.  A text message on March 7, 2013, at 11:10 p.m., from Nicholas Magaw, target telephone number 262-901-5107 to Nathan Froemming which states, "Ik ita late but you wouldn't have a lil bit would yoy…Ik I owe u but imn just streszin."

7

e. A text message on March 8, 2013, at 6:38 a.m., from Nathan Froemming to Nicholas Magaw, target telephone number 262-901-5107 which states "N I'm stressing cuz I'm short I stopped smoking cuz people only care bout themselves."

f. A text message on March 8, 2013, at 7:44 a.m., from Nicholas Magaw, target telephone number 262-901-5107 to Nathan Froemming which states "Ok im about to have another job so ull have some from me soon man."

44. During the monitoring of the cellsite and Global Positioning System (hereinafter "GPS") data of Froemming's cellular telephone and the GPS data from Froemming's blue 2011 Dodge Ram pickup, I was able to confirm the pattern of Froemming's cellular telephone and vehicle traveling on a frequent basis to Froemming's parent's residence in Sullivan and locations believed to be residences of suspected marijuana customers of Froemming.

45. It was difficult to conduct physical surveillance of Nathan Froemming and Joel Froemming and some of their suspected customers at their residences as they are located in rural settings which makes concealing law enforcement presence extremely difficult.

46. S/A Novak was also advised by CI-1 that Froemming had obtained a new pickup, a 2011 or 2012 white Chevrolet, and had traded in the blue Dodge Ram pickup, the vehicle for which the prior warrant for installation and use of an electronic tracking device had been authorized. CI-1 also advised that CI-1 believed Nathan Froemming continues to store quantities of marijuana at his parent's residence which Nathan Froemming then sells. CI-1 identified additional subjects that are purchasing marijuana from Froemming. CI-1 also stated that Nathan Froemming and Heizmann have a safe in their residence, and Heizmann made statements how she and Froemming paid cash for all their purchases and bills and were remodeling the interior and exterior of the residence and paying for it with cash.

47. On June 18 and June 19, 2013, Investigators observed a white Chevrolet Silverado K2500 pickup, bearing Wisconsin registration KA8654, parked in the driveway of Nathan Froemming's residence at W309 N174 Maple Avenue, Waukesha, Wisconsin. The vehicle is registered to Nathan P. Froemming and Maureen Coffey Froemming, W1957 Bakertown Drive, Sullivan, Wisconsin.

48. On June 28, 2013, the Honorable Magistrate Judge Patricia J. Gorence signed a warrant authorizing the installation and use of an electronic tracking device on the white Chevrolet Silverado K2500 pickup, bearing Wisconsin registration KA8654. On July 3, 2013, a GPS monitoring device was subsequently installed on the vehicle.

49. On August 8, 2013, the Honorable Magistrate Judge William E. Callahan, Jr. signed a warrant authorizing the continued use of an electronic tracking device on the white Chevrolet Silverado K2500 pickup, bearing Wisconsin registration KA8654.

8

50. On September 19, 2103, the Honorable Magistrate Judge Patricia J. Gorence signed a warrant authorizing the continued use of an electronic tracking device on the white Chevrolet Silverado K2500 pickup, bearing Wisconsin registration KA8654

51. The GPS data revealed that the vehicle made frequent stops at, and in close proximity to, locations of suspected customers of Nathan Froemming. A review of the pen register and trap and trace data revealed that Nathan Froemming was in contact with suspected customers of Nathan Froemming. In addition, the vehicle frequently travelled to the residence of Joel and Maureen Froemming during the morning hours and other times of the day, including multiple travels to and from the residence on the same day with increasing frequency of this pattern over the past two weeks. After traveling from the residence of Joel and Maureen Froemming, the vehicle has made multiple stops, some of short duration, and in the vicinity of identified marijuana customers of Froemming.

52. I have conducted surveillance at Nathan Froemming and Tiffany Heizmann's residence on numerous occasions and observed Froemming driving the white Chevrolet Silverado from the residence and have never seen anyone other than Nathan Froemming driving the vehicle. I have also observed Froemming operating a Kubota tractor in his yard consistent with the information provided by CI-1.

53. Between the last week of September and the last week of October, 2013, Nathan Froemming's vehicle showed a pattern of frequently traveling to the residence of Joel and Maureen Froemming, including multiple times per day on certain days. In addition, it was the first location the vehicle travels to on certain days, and upon leaving, frequently drove to the vicinity of where customers of Nathan Froemming reside.

54. During that time period, I have observed the pen register and trap and trace data of Nathan Froemming's cellular telephone. A review of this data revealed that Nathan Froemming has had increased telephone contact with his identified and suspected customers.

55. The above travel patterns / location data and call data are consistent with the witness information that Froemming was storing marijuana and / or proceeds at his parent's residence and then making deliveries to customers.

56. Based upon my training and experience, I am also aware that August to October are primary marijuana outdoor grow harvest times not only in Wisconsin but also in the area where Tyler Barnick resides in California.

57. During the investigation, I have obtained numerous subpoenaed financial documents including bank records, credit bureau reports, credit card account information and statements, mortgage documents, vehicle title histories, purchase documents and loan documents and also tax returns from 2009 to 2012, related to Nathan Froemming, Tiffany Heizmann, Joel Froemming and Maureen Froemming.

9

58.     A review of tax return documents for Nathan Froemming revealed that Froemming filed taxes for 2009 and 2011, but had not filed for tax year 2010. For 2009, Froemming claimed total income of approximately $6,100.00 and for 2011, $13,000.00. Froemming listed his address on the returns as W1957 Bakertown Dr., Sullivan, Wisconsin. A review of tax year 2012 revealed that Nathan Froemming claimed $11,700.

59.     A review of tax return documents for Tiffany Heizmann revealed that Heizmann claimed total income of approximately $9,200.00 for 2009, $1,000.00 for 2010, and $12,000.00 for 2011. A review of tax year 2012 revealed that Heizmann claimed total income of approximately $25,000.

60.     A review of tax return documents for Joel Froemming and Maureen Froemming revealed that they claimed total income of approximately $82,000.00 for 2009, $113,000 for 2010, $128,000.00 for 2011, and $96,000.00 for 2012. The listed address on the returns was W1957 Bakerstown Dr., Sullivan.

61.     Mortgage documents received from The National Bank showed that Tiffany Heizmann and her mother, Helga Schimpf, purchased the residence at W309 N174 Maple Ave., in April 2012 for approximately $280,000.00. Approximately $120,000.00 cash was put down on the purchase with a 30 year loan amount for $160,000.00. Monthly payments showed that the payments were being made from a checking account solely in the name of Tiffany Heizmann and another checking account in the joint names of Nathan Froemming and Maureen Froemming, with a listed account address of W1957 Bakertown Dr., Sullivan, Wisconsin.

62.     A review of credit bureau reports and documents from American Express from January 2013 to May 2013 revealed Tiffany Heizmann as a credit card holder with charges to a credit card held in the name of one of the family members that own the business where Heizmann is employed. The cellular telephone of Nathan Froemming is also under the billing account of the business where Tiffany Heizmann is employed.

63.     On numerous dates between September 2012 and October 2013, CI-1 was interviewed and provided detailed information about the current and past drug-trafficking activities of Nathan Froemming and his associates. For several reasons, case agents believe CI-1 is reliable and credible. CI-1 has been providing information since September 2012 which is consistent with evidence obtained elsewhere in this investigation. Substantial portions of CI-1's information have been corroborated through independent investigation, including surveillance, information from other confidential sources, telephone call data and location monitoring, cellular telephone text message content and electronic tracking device data. For example, CI-1 informed case agents that Froemming used (262) 337-2920 to contact customers that were identified by CI-1. Call detail records and text message content confirmed this. In addition, CI-1 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed. For these reasons, I consider CI-1 to be reliable.

64.     In addition, CI-2, CI-3 and CI-4 were interviewed separately and provided information against their penal interest and substantial portions of their information was

corroborated by each of their independent statements. CI-4 also confirmed the information developed regarding CI-4's source of marijuana, and CI-4 identified CI-4's source of supply as Joel Froemming. Futhermore, CI-4 stated that Joel Froemming was involved in marijuana trafficking with whom CI-4 believed was Joel Froemming's son.

65.     A review of online Facebook Accounts revealed that both Nathan Froemming and Tiffany Heizmann have Facebook accounts. Facebook friends of Nathan Froemming included Nick Magaw, Matt Gaynor, Craig Baumann, multiple individuals with the last name Kolodzne, Abigail Harrington and others identified as customers of Nathan Froemming by CI-1.

66.     In addition, I observed a photo posted in August 2012 on Nathan Froemming's Facebook account showing a hand holding an assault pistol with extended magazine and what appears to be an attached silencer.

67.     A review of the Nathan Froemming and Tiffany Heizmann's recent asset purchases, monthly credit card billings, mortgage bills and Nathan Froemming's auto loan bill, without including other common monthly expenditures, revealed that Nathan Froemming and Tiffany Heizmann have expenditures beyond past claimed incomes. This also corroborates the information provided by CI-1 that Nathan Froemming and Tiffany Heizmann are utilizing cash proceeds from drug trafficking to pay for these assets and other expenses through the use of nominee names. Based upon my training and experience, I know that with high amounts of cash down payments on assets is consistent with money laundering activities. The use of smartphones, internet phone services, online purchases, social networking services, including postings on those services and accounts to communicate and conduct transactional activities, is also consistently utilized by those engaged in drug trafficking and money laundering activities by using these means to avoid detection by law enforcement using traditional investigative methods.

68.     On October 24, 2013, the Honorable Magistrate Judge William E. Callahan, Jr. signed a search warrant for the residence of Nathan Froemming and Tiffany Heizmann, at W309 N174 Maple Ave., Waukesha, Wisconsin. The items to be seized included marijuana, proceeds of drug trafficking, documents, computers, cellphones and other electronic media.

69.     On October 28, 2013, the Honorable Stephen L. Crocker, Magistrate Judge, U.S. District Court, Western District of Wisconsin, signed a search warrant for the residence of Joel and Maureen Froemming, at W1957 Bakertown Dr., Sullivan, Wisconsin.

70.     On October 29, 2013, Investigators of the Wisconsin Department of Justice Division of Criminal Investigation executed the search warrants.

71.     Items seized from the residence of Nathan Froemming and Tiffany Heizmann included a small amount of marijuana, approximately $55,000.00 in U.S. currency, cellular telephones, a computer, other electronic devices and media, and documents which included bank records. From a safe at the residence, agents also recovered two photographs; one depicted Nathan Froemming smoking what appeared to be marijuana in front of a large bowl of what

11

appeared to be marijuana; and, the second picture depicted a male with dread-locks standing in front of what I believe to be a marijuana grow with his back to the camera. Based upon in-person encounters with both Nathan Froemming and Tyler Barnick, I believe the photograph of the man with his back to the camera in front of a marijuana grow is either Nathan Froemming or Tyler Barnick.

72. A grand jury subpoena was issued by the U.S. District Court, Eastern District of Wisconsin, to ISB Community Bank, Ixonia, Wisconsin, based upon documents from that institution seized from the residence of Nathan Froemming and Tiffany Heizmann.

73. ISB Community Bank provided records of a checking account held by Nathan Froemming with Maureen Froemming, Nathan's mother, also listed on the account. As of October 31, 2013, the balance listed in the checking account was $10,173.08. In January 2013, the earliest statement supplied by ISB, the account listed a balance of $11,530.05 dated December 18, 2012.

74. During the search of Nathan Froemming and Tiffany Heizmann's residence, agents also seized deposit receipts from ISB Community Bank for an account ending in number 3256. The most recent dated deposit slip seized was dated June 7, 2013 with an account balance of $19,534.21.

75. Subsequently, an additional grand jury subpoena was issued to ISB Community Bank who provided records on November 14, 2013, for an additional account held by Nathan Froemming and Maureen Froemming, account number ending in 3256. The current balance on the account was $16,595.14 as of this date.

76. During an interview of Nathan Froemming, Froemming stated that he obtains in excess of 15 pound quantities of high grade marijuana monthly from an individual for the past one and a half years. Froemming stated he pays $3,800 per pound, and sells it for $200 profit on average, per pound. During the interview, Froemming continually changed his statements as to his income, and acknowledged that he had not worked for the past year and that the income he claimed on his tax returns was accurate.

77. Froemming stated the marijuana that agents located at his father's residence belonged to him, and initially stated his father did not know about it. When confronted with the fact that his father advised agents of the location of the marijuana, Froemming then stated that his father knew about Froemming storing marijuana there, but that all his father did was smoke marijuana.

78. Froemming minimized the profits he makes selling marijuana, but acknowledged using drug proceeds to purchase his all terrain vehicle, his new lawn tractor and for projects he has been performing on his residence, including a current project which consists of what he claimed was a $4,000.00 outside patio / retaining wall.

Case 2:14-mj-01220-WED   Filed 10/27/15   Page 16 of 26   Document 1

79.     Froemming also stated he completed other remodeling work observed at the residence including installing two saunas in the basement, exterior façade stonework, and other upgrades.

80.     Items seized from the residence of Joel and Maureen Froemming included approximately 5.5 pounds of processed marijuana in vacuum sealed plastic bags, numerous empty / cut open vacuum sealed bags, items associated with the distribution of controlled substances, cellular telephones, a computer, other electronic devices and media and documents.

81.     At the residence of Joel Froemming and Maureen Froemming agents also seized a Penny Mustard store receipt dated June 22, 2013, showing a total furniture purchase bill of $10,526.79. The receipt also listed a $4,000.00 cash deposit, and the balance of the bill was paid with a check in the amount of of $6,526.79. The cash deposit of $4,000.00 was paid on June 22, 2013, and the final payoff amount toward the purchase with the check on August 8, 2013.

82.     In part, agents also seized Landmark Credit Union statements from July to September 2013; a Kohl's store receipt dated September 22, 2013 for a purchase with $246.58 paid in cash; and, a Bed Bath & Beyond store receipt dated September 13, 2013, listing a purchase where $672.47 was paid in cash.

83.     Subsequently, a grand jury subpoena was issued to Landmark Credit Union, 5445 S. Westridge Dr., P.O. Box 510870, New Berlin, Wisconsin for account information related to two joint accounts. The first account, identified in seized documents as account 1, was a VIP savings account. The second account, identified through seized documents as account 2, was a VIP checking account. Both accounts are held in the names of Maureen Froemming and Joel Froemming, and are listed under member number 0000659560. According to documents received as a result of the grand jury subpoena which also verified the above information, the ending balance for account 1, VIP Savings, was $13,579.69 as of September 30, 2013. The ending balance for account 2, VIP checking, was $12,430.57 as of September 30, 2013. A review of the balances for the earliest statements provided, September 2012, revealed ending balances in September 2012 of $5,969.82 for account 1, and $3,702.91 for account 2.

84.     In addition to payroll deposits, a review of the Landmark Credit Union statements of the accounts revealed the following:

85.     A $1,000.00 deposit on November 3, 2012 into account 2.

86.     A $6,000.00 deposit on February 12, 2013; a $2,000.00 cash withdrawal on February 23, 2013; and, a $500.00 cash withdrawal on February 23, 2013, all from account 1.

87.     A $1,900.00 deposit on March 11, 2013; a $1,036.00 deposit on March 23, 2013; and, a $726.00 deposit on March 29, 2013, all to account 2.

88.     A check withdrawal of $6,526.79 on August 12, 2013, from account 2 which matches the payoff amount on the Penny Mustard furniture purchase.

13

89. A $6,000.00 deposit on September 25, 2013 to account 1. This deposit occurred approximately one month after a check out of this account was written in the amount of $6,526.79 in order to pay for the remainder of the furniture.

90. During a preview download of a computer seized from the residence of Joel and Maureen Froemming, numerous pictures were identified on the computer which were date stamped September and October 2010 which show marijuana grows in a rural mountainous area, with some of the pictures depicting Joel Froemming, Maureen Froemming and Abigail Harrington standing by the marijuana plants.

91. At this residence, S/A Novak also observed that the handwritten names on the individual vacuum sealed bags of marijuana located at the residence of Joel and Maureen Froemming included the words "Tahoe," and "Maui." Based upon my training and experience, I believe these names signify the type of marijuana contained within the bags.

92. During the search, investigators located a priority mailing slip to 250 Heaaula St., Haiku, Hawaii, in a vehicle at Joel and Maureen Froemming's residence.

93. Investigators contacted a postal inspector employed by the U.S. Postal Service and were advised that the parcel sent from the Sullivan Post office was delivered on October 28, 2013, to 250 Heaaula St., Haiku, Hawaii.

94. During subsequent reviews of documents seized, database checks, pen register review and physical surveillance by law enforcement in Haiku Hawaii, it was determined that Tyler Barnick and Abigail Harrington were currently residing at 250 Heaaula St., Haiku, Hawaii.

95. Based on this investigation, on November 4, 2013, the Honorable Magistrate Judge Barry M. Kurren of the U.S. District Court, District of Hawaii, signed a search warrant for the residence of Tyler Barnick and Abigail Harrington.

96. On November 5, 2013, the search warrant was executed and Tyler Barnick and Abigail Harrington were present. Pursuant to the search warrant, agents seized from the residence approximately $5,850 in U.S. currency, $5,400 of which was in $100 bills secreted in a camera case in a bedroom closet; six cellular telephones, including telephones bearing telephone numbers called by Joel Froemming, Nathan Froemming and Maureen Froemming; a computer, and numerous documents.

97. A review of the cellular telephones revealed that Barnick had issued a check in the amount of $10,000.00 on November 4, 2013 on an account through Umpqua Bank as an escrow down payment for a property purchase in Hawaii. Documents related to the property purchase showed an agreed upon purchase price of $230,000 for the property with Barnick to provide an additional $47,500 in cash, not including closing costs, in addition to the $10,000.000 escrow payment at time of closing.

14

98.     Also included in the documents were copies of Barnick's 2011 and 2012 income tax returns. For 2011, Barnick claimed adjusted gross income of approximately $16,700 and for 2012, Barnick claimed an adjusted gross income of approximately $12,600.

99.     Also seized from the residence were miscellaneous documents and receipts. A review of these items by your affiant revealed that there were numerous receipts for items paid for in cash. There were a total of approximately $9,300 in cash receipts, and $4,500 in credit card receipts that were dated between August and October 2013, with the receipts from Hawaii.

100.    Two rental / lease agreements were also seized with a rental agreement for a residence in Hawaii for the months of August and September 2013 in the amount of $2,092.00 per month, and another for the residence on Heaaula St. signed in August 2013 for rent / lease of that residence in the amount of $2,800.00 per month.

101.    Also located in the residence was an empty priority parcel mailing box from "Froemming" listing the address of Joel and Maureen Froemming in Sullivan, Wisconsin, to Ty Barnick with the Heaaula Street residence listed for Barnick.

102.    S/A Novak spoke with Barnick and Harrington separately. Barnick initially denied having received a parcel mailing from Wisconsin or his parents. Barnick then stated that they had received a mailing from Joel and Maureen Froemming, but he had taken the box to the recycling center. Barnick stated that it contained four articles of baby clothing and some movies. When advised that agents had found the box in the residence, and when asked why there were parts of the mailing labels on the parcel that were blacked out with a type of marker, Barnick stated he didn't know.

103.    Barnick denied ever growing marijuana, and stated that he rented his properties in California to an individual and was not aware of any marijuana grows on his properties. Barnick initially stated he was employed for North Cal Lumber Company, and they had transferred him to Hawaii for work. Barnick stated he was also self-employed as a furniture maker under the business name Cal Coast Designs LLC. Barnick subsequently stated he was not actually transferred to Hawaii by North Cal Lumber Company and hadn't actually worked for them since moving to Hawaii as he was busy preparing for the birth of his child with his girlfriend, Abigail Harrington, who was pregnant with their second child. Barnick stated he was making furniture, and had sold some furniture. When asked for receipts, Barnick stated he didn't have any as his customers paid cash and that was what the money seized from his residence was from. When asked why it was all in $100 bills, Barnick stated that was how his customers paid him, and then stated that he did have receipts at his shop in California but did not have any receipts with him in Hawaii.

104.    Barnick stated that they paid $2,800 in rent the past two months at their Heaaula Street residence and paid approximately $2,000 per month at their previous residence in Hawaii after moving from California in approximately July-August 2013. Barnick also stated he paid $1,000 per month in rent at his shop space in Ukiah, California, which is where Barnick stated he built furniture. Barnick stated that he and Harrington had been living at the cabin on one of the

15

parcels in Ukiah, but he had not been involved in growing marijuana plants there or anywhere else and did not sell marijuana. Barnick stated he only used marijuana. Barnick denied purchasing or being in the process of purchasing any property until confronted with the information regarding his purchase of the property in Hawaii with the $10,000 escrow check written by Barnick the previous day, and Barnick stated he misunderstood the question.

105. Harrington stated she had not worked for approximately the last three years since their daughter was born. Harrington stated she was supported financially by Barnick, and did not involve herself in his finances. Barnick stated they had resided in Ukiah, California, until approximately August 2013 when they moved to Hawaii. They had been staying at the cabin on Barnick's property in California and she also stayed at times with her mother in Washington.

106. Based upon my training and experience, your affiant is familiar with the appearance of marijuana plants. During a preview of the Apple computer seized from the residence of Barnick and Harrington, your affiant observed numerous pictures of Barnick standing amongst large marijuana plants along with numerous pictures of large marijuana grows.

107. Through database checks, William M. Gaynor, a/k/a Matthew Gaynor, is known to use address of 25700 String Creek Rd, Willits, California, which is also located in Mendocino County as are Barnick's properties. The cellular telephone being utilized by Gaynor lists to Aileen Gaynor at 25700 String Creek Rd, Willits, California.

108. S/A Novak had contact with California law enforcement authorities who advised that they believe there are multiple marijuana grows located on the property at 25700 String Creek Road.

109. During a review of the cellular telephones seized from Tyler Barnick and Nathan Froemming, numerous text messages were observed between them and William Gaynor. During the text messages with Barnick, Barnick referred to people that Barnick could not trust and had "turned" on him. During the text messages with Nathan Froemming, some of the messages related to drug transactions and / or growing marijuana such as a text from Gaynor to Froemming where Gaynor states, "getting ready for season, first free time in two weeks."

110. During a review of the pen register and trap and trace data captured, through the following dates there were a total of 62 calls / contacts between Gaynor and Nathan Froemming between November 2012 and August 2013 and 100 calls / contacts between Gaynor and Barnick between November 2012 and February 2014.

111. During a review of the cellular telephone of Tyler Barnick, a contact was listed for Nathan Froemming as nate.froemming@facebook.com. Nathan Froemming's Facebook ID was determined to be 100001909150248.

112. Additional Facebook accounts were located and identified for Abigail Harrington of https://www.facebook.com/abigail.harrington.14 and Facebook ID of 100001054355653, for Maureen Froemming of https://www.facebook.com/maureen.froemming.7 and Facebook ID of

16

100000116045216, for Tiffany Heizmann of https://www.facebook.com/tiffany.marie.129 and Facebook ID of 611277110 and for William M. Gaynor of https://www.facebook.com/MattGaynor?fref=ts&ref=br_tf and Facebook ID of 656473914.

113.    On November 5, 2013, a Wisconsin Department of Justice, DCI Special Agent, along with California authorities, executed search warrants at the properties owned by Barnick in Ukiah, California. There were large harvested marijuana grows with a few marijuana plants remaining. The grow sites also had processed marijuana hanging in trees, and a large volume of marijuana remnants from processing of marijuana. Located in the residence / cabin was approximately $2,800.00 in cash and numerous belongings of Barnick and Harrington including documents, packets of marijuana seeds individually packaged, suspected drug notations/logs with the names and amounts, and handwritten expense logs related to the property. Agents also seized numerous individual plastic sandwich bags containing handwritten notations and marijuana remnants. Based upon my training and experience, I know that these bags are consistent with marijuana growers keeping various strains of marijuana and their seeds separate to identify the different strains of marijuana that are grown. The words "Tahoe" and "Maui" were also handwritten on the bags.

114.    On November 5th and 6th, 2013, Wisconsin Department of Justice DCI Special Agent, and California authorities also executed search warrants at two rental storage units in Ukiah, California which Barnick had identified as housing his business and associated with his business. Items seized included a large cash money counting machine, a customized military truck vehicle, and documents. A subject was interviewed that owned a custom vehicle shop nearby who stated that the subject had performed customized body work on the truck for Tyler Barnick.

115.    One of the handwritten expense logs found at the cabin/residence of Barnick and Harrington in Ukiah, California, included a notation of $2,500 paid to the owner of the custom body work shop with whom agents had spoken.

116.    Agents subsequently spoke with the registered owner of the customized military vehicle located in the rental unit who advised that Barnick owned the vehicle. The subject had registered the vehicle in the subject's name because the subject was going to work with Barnick in furniture making, and they were going to use it for hauling wood products. The subject acknowledged that the truck was not suited for that purpose because of its large size, and, in fact, wasn't used for that purpose. The subject further stated that Barnick had paid $9,000 for the vehicle and had paid for all the customized work on it. The subject stated he simply had not changed the registration of the vehicle since it was in the subject's business name.

117.    A grand jury subpoena was issued to Umpqua Bank, in Ukiah, California after it was learned that Tyler Barnick had an account with that institution.

118.    Umpqua Bank provided records of a checking account, number xxxxx2852, in the sole name of Tyler J. Barnick with a mailing address of P.O. Box 514, Talmage, California. The balance in the checking account was $24,638.80 as of November 6, 2013, after the

17

$10,000.00 check had been cashed for the escrow payment on Barnick's property purchase in Hawaii. The documents received consisted of monthly statements for 2013. There were two large even dollar cash amount deposits: a $10,000.00 deposit on March 19, 2013; and, a $19,000.00 deposit on April 16, 2013. The highest balance for the time period of the statements provided was $62,267.52. There were also monthly debits of the same amount, $3,221.56 which were indicated as a loan payment.

119. The $10,000.00 escrow check written on the Umpqua Bank account of Tyler Barnick was endorsed to Title Guaranty Escrow Services, Inc. A review of correspondence between Title Guaranty Escrow Services, Barnick's real estate agent, and Barnick showed that the check was delivered to Title Guaranty Escrow Services, Inc. at 80 Puunene Ave., Kahului, Hawaii 96732.

120. A subpoena was issued to Title Guaranty Escrow Services Inc. which provided records confirming the agreed upon property purchase in Hawaii by Tyler Barnick, with the agreed upon purchase price of $230,000.00 with $10,000.00 to be supplied by Barnick for the purchase to be put into escrow, and an agreed upon additional $47,500.00 in cash to be supplied by Barnick at time of closing.

121. The Umpqua Bank account information received via subpoena confirmed that the $10,000.00 check had been cashed on November 6, 2013.

122. On November 5, 2013, agents spoke with Coldwell Banker Island Properties Realtor Ken Smith who stated that he was assisting Tyler Barnick in locating a property to purchase, and confirmed that he had assisted Barnick in the purchase of the referenced property for $230,000.00. Smith confirmed that Barnick had issued a $10,000.00 check payment for an escrow payment toward the property and the check was written to Title Guaranty Escrow Services.

123. On January 17 and 27, and March 10, 2014, preservation letters were served on Facebook on accounts https://www.facebook.com/records/x/login/#!/nate.froemming?fref=ts and nate.froemming@facebook.com and Facebook ID of 100001909150248, assigned Facebook case numbers 338940, 339011, 343946 and 364363.

124. On January 25 and March 10, 2014, preservation letters were served on Facebook on accounts https://www.facebook.com/abigail.harrington.14 and Facebook ID of 100001054355653, https://www.facebook.com/maureen.froemming.7 and Facebook ID of 100000116045216 and https://www.facebook.com/tiffany.marie.129 and Facebook ID of 611277110, assigned Facebook Case numbers 343162, 343163 and 364363. These case numbers also encompassed preservation requests to Facebook for the target Instagram accounts. To this end, as the preservation letters on these dates also encompassed the request to preserve Instagram material, the preservation requests were given the same case number by Facebook.

18

125. On January 29 and March 10, 2014, preservation letters were served on Facebook on account https://www.facebook.com/MattGaynor?fref=ts&ref=br_tf bearing Facebook ID of 656473914, and assigned Facebook case numbers 345363, 345369 and 364363.

126. On May 2, 2014, a preservation request was served on Instagram for user ID 656473914, and assigned Case # 388999.

127. An Instagram user ID of 611277110 was also identified for Tiffany Heizmann. On March 10 and May 2, 2014 preservation requests were submitted to Instagram for Instagram user ID of 611277110. The May 2, 2014, preservation request was assigned Case # 388999.

128. In addition, during a review of data obtained from the cellular telephones, computers and other electronic media seized during the execution of the search warrants on October 29 and November 5, 2013, respectively along with data base checks revealed Yahoo email addresses for Nathan Froemming as natefroemming@yahoo.com, Tiffany Heizmann as sugerysweet30567@yahoo.com, Abigail Harrington as abi_israel@yahoo.com, and Tyler Barnick as tai_israel@yahoo.com and calcoastdesigns@yahoo.com.

129. On January 29, 2014, March 12, 2014, April 10, 2014 and May 8, 2014, respectively preservation letters were sent to Yahoo! Inc. for the email addresses abi_israel@yahoo.com, tai_israel@yahoo.com and calcoastdesigns@yahoo.com, which included Yahoo! Inc. reference numbers 254069 and 254251. Other reference numbers were not provided.

130. On April 14, 2014 and May 8, 2014, preservation letters were sent to Yahoo! Inc. for the email addresses natefroemming@yahoo.com andsugerysweet30567@yahoo.com, which included Yahoo! Inc. reference numbers 254069 and 254251.

131. Throughout the course of this investigation, your affiant has discovered that members of the Froemming drug trafficking organization utilize cellular telephones and other wireless communication devices to communicate with one another, take photographs of themselves and other members engaging in criminal activity, and through the use of communication software, post pictures and other information onto social media sites. Based upon my training, experience, and familiarity with the investigation, such as the review of seized text messages, e-mails and Facebook messages, your affiant believes that the aforementioned Yahoo accounts may be used to relay criminal conversation and/or images that represent illegal conduct.

## BACKGROUND CONCERNING E-MAIL

132. In my training and experience, I have learned that Yahoo! Inc. provides a variety of on-line services, including electronic mail ("e-mail") access, to the public. Yahoo! Inc. allows

19

subscribers to obtain e-mail accounts at the domain name yahoo.com, like the e-mail account[s] listed in Attachment A. Subscribers obtain an account by registering with Yahoo! Inc. During the registration process, Yahoo! Inc. asks subscribers to provide basic personal information. Therefore, the computers of Yahoo! Inc. are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Yahoo! Inc. subscribers) and information concerning subscribers and their use of Yahoo! Inc. services, such as account access information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

133.    A Yahoo! Inc. subscriber can also store with the provider files in addition to e-mails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to e-mails), and other files, on servers maintained and/or owned by Yahoo! Inc. In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

134.    In my training and experience, e-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

20

135.    In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account cn their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

136.    In my training and experience, in some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

137.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Yahoo!, Inc. to disclose to the government copies of the records and other information

21

(including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

138.　Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of violations, or attempted violations, of Title 21, U.S.C. § § 846 and 841 and Title 18, U.S.C. § 1956, may be located in the Yahoo accounts described in Attachments A.

139.　Based on the forgoing, I request that the Court issue the proposed search warrants. Because the warrants will be served on Yahoo! Inc. who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

140.　This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

141.　Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. Because the warrant will be served on Yahoo!, Inc., who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

22